MATTHEW G. WHITAKER
Acting Attorney General of the United States
DAYLE ELIESON
United States Attorney
District of Nevada
PHILLIP N. SMITH, JR.
Assistant United States Attorney
Nevada Bar No. 10233
Special Assistant United States Attorney for the District of Arizona
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Telephone: (702) 388-6336
Facsimile: (702) 388-5087
phillip.smith@usdoj.gov

Attorney for Plaintiff
United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

-oOo-

| | |
|---|---|
| United States of America, ) | 4:18-cr-1589-RCC-LCK |
| ) | |
| Plaintiff, ) | Government's Response to the Defendant's |
| ) | Sentencing Memorandum [ECF No. 23] |
| vs. ) | |
| ) | |
| Joseph Michael Gill, ) | |
| ) | |
| Defendant. ) | |

**Relevant Procedural History**

On August 16, 2018, the defendant, Joseph Michael Gill, pleaded guilty to an information charging him with one count of Dealing in Firearms Without a License in violation of 18 U.S.C. §§ 923(a) and 924(a)(1)(D), pursuant to a plea agreement. ECF Nos. 1, 5, 8, and 12. The defendant is scheduled to be sentenced on January 7, 2019.

On December 13, 2018, Gill filed a sentencing memorandum ("DSM") requesting a downward variance or downward departure from the applicable advisory United States Sentencing Guidelines ("U.S.S.G.") range. ECF No. 23. Gill's sentencing memorandum specifically requests that this Court impose a sentence of probation. The government now

1

respectfully files this response in support of a requested sentence of **18 months of imprisonment**, with three years of supervised release to follow, along with a $50,000 fine.

## Argument

On November 14, 2018, the United States Probation Office prepared a Presentence Investigation Report ("PSR") ahead of the defendant's imposition of sentence. After an application of the advisory U.S.S.G. and the computation of the defendant's criminal history category, the PSR determined that the applicable guideline range for imprisonment was 18 to 24 months. PSR ¶ 84. The PSR's computation of the defendant's criminal history placed him in criminal history category I with zero criminal history points. PSR ¶ 36. The PSR calculated the total offense level as 15. This calculation was based on the United States Probation Office's determination that 1) the base offense level was 12 pursuant to U.S.S.G. § 2K2.1(a)(7); 2) there was a two-level increase pursuant to Section 2K2.1(b)(1)(A) because the offense involved three to seven firearms; 3) there was a four-level increase pursuant to Section 2K2.1(b)(5) because the defendant engaged in the trafficking of firearms; and 4) the defendant is entitled to a three-level reduction in offense level for timely acceptance of responsibility pursuant to Section 3E1.1. PSR ¶¶ 22-32.

The PSR recommends a sentence of five years of probation pursuant to a downward variance under 18 U.S.C. § 3553(a), along with a fine of $15,000. For the reasons below, the United States respectfully disagrees with the PSR's recommendation and submits that a sentence of 18 months, with a three-year-term of supervised release to follow along with a $50,000 fine is sufficient, but not greater than necessary, in consideration of the statutory sentencing factors enumerated in 18 U.S.C. § 3553(a), and respectfully requests the Court impose it.

**I.     Sentencing Argument.**

This case arose out of an investigation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Drug Enforcement Administration ("DEA") into illegal gun dealing by the defendant, who at the time was a Special Agent with the DEA. During the

course of the investigation, ATF and the DEA learned that the defendant had illegally sold scores of firearms without the required federal firearms license ("FFL"), and that the defendant did so in knowing and direct contravention of federal law. The defendant opted to plead guilty to a one-count information charging him with selling firearms illegally. In support of his request for a sentence of probation (notwithstanding the serious nature of the defendant's offense of conviction and relevant conduct), Gill primarily offers the following:

1. The defendant's crime is "one of willful ignorance rather than one that is the product of substantial reflection and consideration before its commission." DSM at 2.
2. The defendant "had a model career in law enforcement, not only as a Special Agent, but also as a Supervisory Special Agent." *Ibid*.
3. The defendant "achieved numerous meritorious accomplishments during his career … that separated and distinguished him from many of his colleagues with the most positive of distinctions." *Id.* at 3.
4. "[T]he recommended sentence [of probation] would afford adequate deterrence to criminal conduct, not only to [Gill], but to other current law enforcement officers who sell firearms (as many do) but are ignorant to the applicable law." *Ibid*.
5. The defendant "has no criminal history whatsoever." *Ibid*.
6. This case (according to the defendant) does not involve "false statements in firearms-related paperwork" or "… the knowing and intentional sale of firearms to prohibited possessors." *Ibid*.
7. The defendant "accept[ed] responsibility in an extremely timely fashion that conserved substantial resources of all parties." *Ibid*.

The government respectfully submits that none of these reasons constitutes a justification for a sentence of probation. At the outset, the government would note that in the plea agreement, the defendant admitted to the following:

> On June 12, 2016, Defendant JOSEPH MICHAEL GILL
> purchased three (3) identical rifles (based on make and model)
> from an online Federal Firearms Licensee (FFL) named

3

> BudsGunShop.com located at 1105 Industry Rd., Lexington, Kentucky 40505. GILL paid a total of $1,896.00 U.S. dollars for all three rifles ($632.00 each). These firearms were subsequently shipped in interstate commerce from BudsGunShop.com to an FFL identified as Brown Family Firearms, located in Sahuarita, Arizona, so that they could be transferred to GILL.
>
> On June 18, 2016, GILL took possession of these three (3) rifles from Brown Family Firearms. The weapons are identified as the following:
>
> • One (1) Colt, model M4LE (also identified as CEIOOO), .223/5.56 caliber rifle, Serial Number LE412445;
> • One (1) Colt, model M4LE (also identified as CEIOOO), .223/5.56 caliber rifle, Serial Number LE411087; and
> • One (1) Colt, model M4LE (also identified as CEIOOO), .223/5.56 caliber rifle, Serial Number LE411799.
>
> **On July 27, 2016, GILL sold the aforementioned rifle bearing serial number LE412445 to an individual that he (GILL) had reason to believe intended to use or dispose of the firearm[] unlawfully. On July 28, 2016, GILL sold the aforementioned rifle bearing serial number LE411087 to an individual that he (GILL) had reason to believe intended to use or dispose of the firearm[] unlawfully.** GILL therefore engaged in the trafficking of firearms as defined by Application Note 13 of USSG § 2K2.1. The aforementioned occurred in the State and Federal District of Arizona, and elsewhere. (Emphasis added).

ECF No. 8, at 10.

In addition to admitting the aforementioned facts (under penalty of perjury) as constituting the factual basis of his plea, Gill also specifically admitted that he was subject to a four-level enhancement for trafficking firearms pursuant to U.S.S.G. § 2K2.1(b)(5)(A). *Id.* at 3. Some additional context is appropriate here. It is abundantly clear that Gill committed this crime *with clear knowledge that he was violating federal law:*

> ATF records revealed that in November 2012, the defendant obtained an ATF Curio and Relics (C&R) license. The license was renewed on October 1, 2015, but was surrendered and submitted to ATF's Out of Business Records Branch. **Records also reveal that in December 2012, the defendant submitted an application for an FFL, but voluntarily withdrew the application due to the fact**

4

**that he did not receive prior approval from his employer [(the DEA)].**[1]

PSR ¶ 10.

This clearly establishes that the defendant—himself a federal law enforcement agent—very well knew that in order to sell firearms, he was required to obtain and possess a federal firearms license from ATF. It also establishes that despite that knowledge, and motivated by his desire to illegally profit from his own criminal conduct, he continued to sell firearms illegally. As the PSR correctly notes, the defendant sold two of the rifles charged in the information to two separate members of a drug trafficking organization. The person who the defendant sold one of the rifles to on July 28, 2016 (Mauricio Balvastro) was not the same person he had sold a rifle to the day before on July 27, 2016 (Jesus Martinez), and Balvastro represented to Gill that he was an "associate" of Martinez. The circumstances of these two sales would have put any reasonable person—especially a federal agent—in apprehension of the inappropriateness of selling the firearms to these two individuals, but Gill proceeded anyway.[2]

The government also disagrees with the assertion in Gill's sentencing memorandum that his crime is mitigated because it is "one of willful ignorance." Rather, Gill's crime appears to have been motivated by a desire for economic profit, pure and simple. He sold weapons when he knew he should not have, and under circumstances which he should not have. As the PSR notes, Gill sold two of the rifles at issue here for $1,000 each—meaning he made almost a 60% profit on each. Not only did Gill sell firearms in knowing and direct contravention of federal law, he was a prolific gun seller; ATF records "… revealed that since 2011, the defendant purchased approximately 64 firearms from licensed dealers including 13 firearms subject to the National Firearms Act[3], and sold approximately 100 firearms utilizing the internet site, Gunbroker.com." PSR ¶ 10.

---

[1] It is the understanding of the undersigned that the DEA would not approve of Gill's desire to sell firearms merely because the DEA did not want an active federal agent (especially a supervisor) to be involved with outside for-profit employment. Gill withdrew his FFL application in February 2013.

[2] It is also reasonable to assume that the defendant would have sold the third Colt M4LE rifle had the DEA not intervened (after one of the illegally sold rifles was intercepted en route to Mexico) and "directed the defendant to cease and desist selling his privately owned weapons." PSR ¶ 8.

[3] Firearms subject to the National Firearms Act include such items as suppressors (commonly known as "silencers"), short-barreled rifles, and sawed-off shotguns.

These facts also detract from the significance of Gill's claim that his crime does not involve "… the knowing and intentional sale of firearms to prohibited possessors." DSM at 4. Since the defendant was selling large numbers of firearms to whomever would purchase them— a;; without conducting any back ground checks and while ignoring red flags as to the appropriateness of the sale—we simply cannot know the full breadth of the characteristics of the individuals to whom he illegally sold weapons.

It further bears mentioning that the specific firearms at issue here are high-powered semi-automatic assault weapons that are essentially military-style assault rifles adapted for civilian use. Additionally, as the PSR correctly notes, the defendant sold one of these weapons to a member of a drug trafficking organization "who was attempting to transport the rifle to Nogales, Sonora, Mexico." PSR ¶ 6; *see also* Exhibit 1 (two photographs of the Colt Model M4LE recovered from Gill's residence pursuant to an ATF search warrant and a photograph of the Colt Model M4LE the defendant sold illegally which was later seized before it could be smuggled into Mexico).

The PSR notes that "[r]ecords from GunBroker.com revealed that the defendant had an active account and had been a member since 2000" and that "[f]rom 2000 to 2016, the defendant has an approximate 645 sales transactions recording on the site. He sold approximately 100 firearms to various individuals throughout the United States, of which 50 firearms were sold between 2012 and 2016." This evinces the fact that the defendant may have very well engaged in the illegal conduct that forms the basis of this case for well over a decade.

At a minimum, the defendant's provably *knowing and willful* illegal conduct apparently spanned at least three years (commencing from the time he withdrew his application for an FFL). Perhaps most shockingly, the defendant committed this crime with assumed knowledge of the infamous joint DEA-ATF "Operation Fast and Furious," which resulted in a federal agent being murdered by a weapon that had been acquired illegally by a straw purchaser and had ended up in Mexico. Gill obviously knew about the danger of illegally selling firearms in a

6

border state such as Arizona, having "had a … career in law enforcement, not only as a Special Agent, but also as a Supervisory Special Agent." DSM at 3.

During the course of the investigation, ATF and DEA interviewed fellow DEA agents at the defendant's District Office. One such agent was asked if the defendant had knowledge of ATF gun laws, and the agent replied, "Oh, I'm pretty damn sure [Gill] knows gun laws very well." This is consistent with another DEA agent indicating that he "gave the defendant several firearms to sell on his behalf in April or May 2016, because he knew the defendant sold guns 'on the side' and believed he had an FFL." PSR ¶ 14. The defendant's illicit gunrunning also included at least one stolen handgun. PSR ¶ 15. As part of this particular transaction, the defendant "informed the purchaser he would run [a] firearm in NCIC to ensure it was not stolen prior to sending it …." The ATF investigation revealed that the defendant in fact used NCIC on February 21, 2013 to conduct a records query on a firearm he had sold to an individual who resided in Idaho. This act constituted yet another violation of federal law—*i.e.*, making personal use of the NCIC system.

To the extent that the defendant's sentencing memorandum suggests that this Court should impose a well-below-guideline-range sentence of probation because the defendant "has no criminal history whatsoever" and because of his acceptance of responsibility "in an extremely timely fashion that conserved substantial resources," DSM at 3, it must be noted here that the applicable guideline range already takes both of those factors into account. The defendant's criminal history score—zero—and the fact that he accepted responsibility for his crime in a timely manner is the reason why his guideline range is 18-24 months.

Had the defendant had a criminal history or had he not pleaded guilty in a timely manner, he would be facing a higher sentence. As it stands, the Sentencing Commission has built in a mechanism for the Court to impose a lesser sentence based on a defendant's timely acceptance of responsibility and the conservation of prosecutorial and court resources—*i.e.*, U.S.S.G. § 3E1.1. The government submits that it would be inappropriate (especially under the

7

facts and circumstances of the instant case) to afford further benefit or consideration for the defendant's decision to plead guilty.

The government would also note here that the plea agreement affords the defendant additional benefits that may not be immediately apparent to the Court—*i.e.*, the government not pursuing 1) an increase for the true number of firearms involved in the defendant's scheme to illegally sell firearms (which would result in an 8-level increase pursuant to Section 2K2.1(b)(1)(D)); 2) an increase in his base offense level from 14 to 20 because the offense involved a semi-automatic firearm capable of accepting a large capacity magazine—*i.e.*, the Colt M4LE rifles—and the defendant was convicted under 18 U.S.C. § 922(a)(6) and committed the offense with reason to believe that the offense would result in the transfer of a firearm to a prohibited person pursuant to Section 2K2.1(a)(4)(B); or 3) a 4-level increase for the defendant transferring any firearm with knowledge or reason to believe that it would be transported out of the United States pursuant to Section 2K2.1(b)(6)(A).

This brings us to deterrence. Despite Gill's assertion that "it is difficult to fathom that [he] will commit future crimes," DSM at 3, there is still a palpable need for deterrence here pursuant to 18 U.S.C. § 3553(a)(2)(B), and the need for deterrence in this case extends far beyond preventing just the defendant from committing additional crimes. For example, on the subject of general deterrence, in *United States v. Politano*, 522 F.3d 69 (1st Cir. 2008), the Court held:

> Indeed, the § 3553(a) factors expressly provide for consideration of general deterrence: section 3553(a)(2)(B) states that "[t]he court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to afford adequate deterrence to criminal conduct." General deterrence is about preventing criminal behavior by the population at large, and, therefore, incorporates some consideration of persons beyond the defendant.

*Politano*, 522 F.3d at 74.

Individuals who illegally sell firearms (such as Gill) pose a clear and present danger to society as a whole. Guns ending up in the hands of the wrong people is a major cause of gun

8

violence in the United States (and elsewhere). The Gun Control Act (which requires an individual to obtain an FFL in order to sell firearms) was passed in part as a means to help keep guns out of the hands of the wrong people. The nature and circumstances of the defendant's offense, therefore, warrant a custodial sentence in order to serve a deterrent effect. A belief that the defendant will not re-offend is insufficient—the Court must impose a sentence that will adequately deter those individuals in the future who will face the temptation of committing similar crimes. *See, e.g.*, *United States v. Medearis*, 451 F.3d 918, 920-21 (8th Cir. 2006) (holding that courts must give "proper weight" to general deterrence as one of the "key purposes of sentencing").

A sentence of probation, as requested by the defendant, will most assuredly not serve that purpose. Rather, it will inappropriately minimize the defendant's conduct specifically, and similar conduct generally. Notably, in all Southwest border states, law enforcement agencies are continually fighting to stop the flow of guns from the United States to Mexico. *See generally*, ATF Project Gunrunner Summary, at http://www.atf.gov/firearms/programs/project-gunrunner/. The defendant's conduct obviously undermined that effort. In addition, there are aggravating circumstances here. The defendant was a sworn federal agent at the time he committed this crime, and he knew what he was doing was a crime and did it anyway—all for personal profit. He also continued to do it despite being on notice that his crime had the potential to be compounded (*i.e.*, the guns he illegally sold being used in other crimes or being smuggled out of the country).

The investigation also uncovered the fact that Gill used his government-issued cell phone in furtherance of his illegal scheme. On October 11, 2016, Gill's work cell phone was forensically imaged by a Cyber Investigations Officer ("CIO") from the DEA Office of the Inspector General. In relevant part, the CIO's forensic image of the defendant's work cell phone revealed the following (all of this information has been previously provided to defense counsel):

- On May 12, 2016, Gill communicated with an unknown person and said, "I ordered three rifles to resell…but I think they are sold out already."

9

- On July 24, 2016, Gill communicated with an unknown person and said, "The guy texted me just now about the pistol tomorrow."
- On July 27, 2016, Gill communicated with an unknown person and said, "If you want another one of the colt m4's let me know. I still have one left. I also have some handguns and a Remington 870 police shotgun that I am selling if ur looking [sic]."
- On July 28, 2016, Gill communicated with an unknown person and said, "Another guy wants to buy a rifle in 30 mins at the mall." On this same date, Gill again communicated with an unknown person and said, "Hey, if you want the [AK] pistol let me know and I will hold it for you, otherwise I am gonna post it on backpage this weekend."
- On July 30, 2016, Gill stated to an unknown person that he had a Remington 870 12-gauge shotgun available. On this same date, Gill communicated with an unknown person and said, "I'm the guy who bought the .40 (2) from the other day. I'm considering picking up a rifle. You mention you had some can you [sic]."
- On August 4, 2016, there were five text messages between Gill's work phone and David Balvastro's phone number. These communications took place five days after the July 30, 2016, seizure of the Colt M4LE rifle in Nogales, Arizona. The content of these messages could not be recovered.
- Gill was in communication with a direct subordinate employee, DEA Special Agent Erik Vasquez, via WhatsApp Messenger between April 25, 2016, and May 26, 2016.
- Vasquez requested that Gill sell a shotgun, rifle and handgun. Gill advised it was best to post the shotgun on backpage.com and sell it locally in Tucson. Gill further stated, "That's usually how I sell a lot of mine." Gill told Vasquez that he

- had seven "870's" (Remington Model 870 shotguns), but that he was always in the market to purchase additional weapons.
- Gill then stated he would sell the firearms for Vasquez on the internet and told him, "Sounds good, bring them in when you can and I will take detailed pics and ship them out for you when they sell. I have my [FFL] so I can transfer them to the buyer/other dealer." As noted above, Gill did not have an FFL.
- On May 14, 2016, Vasquez gave his firearms to Gill to sell. On May 24, 2016, Gill told Vasquez that all three weapons were sold and that he could meet up and give him (Vasquez) the cash.
- On May 26, 2016, Gill and Vasquez agreed to meet, with Gill later telling Vasquez, "I'm in my blacked out 300." Gill was most likely referring to his Official Government Vehicle, which was a 2012 black Chrysler 300.

Gill's conduct was not only a direct violation of federal law, but it was also a betrayal of his oath of office. Based on the totality of the circumstances here, the government submits that it is extremely important for both general deterrence and protection of the public that people like the defendant receive noteworthy sentences for their willingness to acquire firearms and sell them illegally. Contrary to Gill's assertion, a sentence of probation would not serve an efficacious purpose with regards to deterrence. It should also be noted that Gill is not like "other current law enforcement officers who sell firearms (as many do) but are ignorant to the applicable law," DSM at 3, because Gill knew the law and knew that we he was doing was a crime.

The government does not dispute that the defendant may have "achieved numerous meritorious accomplishments during his career … that separated and distinguished him from many of his colleagues with the most positive of distinctions." DSM at 3. The fact that he was promoted to the position of Supervisory Special Agent would seem to be a testament to his professional success. However, that actually is an aggravating factor, not a mitigating one. The

11

taxpayers of this country expect a person in the defendant's position to uphold federal law, not to egregiously and greedily violate it, and over an extended period to boot.

Finally, the PSR writer's stated reasons for recommending a downward variance—that "[t]he instant offense appears to represent poor decision making on behalf of the defendant, who otherwise appears to be a law-abiding, contributing member of society" and that the "defendant's education and vocational skills, employment record, [and his] performance on pretrial supervision," PSR ¶ 58, are what one would expect from a person with no prior criminal history. Notably, despite those aforementioned factors, the defendant nevertheless clearly does not qualify for a downward departure for aberrant conduct (pursuant to U.S.S.G. § 5K2.20), nor does the PSR recommend such a departure.

The PSR does, however, indicate that "[p]ursuant to §5K2.0, the Court may depart downward based on the timely disposition of the case resulting in a cost savings to the government and the [C]ourt." PSR ¶ 86. This appears to be the PSR writer's suggestion that the Court can depart downward pursuant to Section 5K2.0 solely because the defendant pleaded guilty in a timely fashion and therefore obviated the need for a trial. The undersigned respectfully submits that this is incorrect. In fact, Section 5K2.0(d) specifically precludes the Court from departing downward based on either "[t]he defendant's acceptance of responsibility for the offense, which may be taken into account only under § 3E1.1 (Acceptance of Responsibility)"[4] or "[t]he defendant's decision, in and of itself, to plead guilty to the offense or to enter a plea agreement with respect to the offense." *See* U.S.S.G. § 5K2.0(d)(2) and (4).

In conclusion, the government submits that sentence of 18 months in custody (which is at the low end of the applicable Guidelines range) is therefore appropriate under the factors set forth in 18 U.S.C. § 3553(a)—particularly, pursuant to 18 U.S.C. § 3553(a)(2)(A)'s requirement for a sentence "… to reflect the seriousness of the offense to promote respect for the law, and to

---

[4] U.S.S.G. § 3E1.1(b) contemplates an additional one-level reduction if the defendant pleads guilty in a timely fashion so as to permit "the government to avoid preparing for trial and permit[] the government and the court to allocate their resources efficiently …."

12

provide just punishment for the offense …" and 18 U.S.C. § 3553(a)(2)(B)'s requirement for a sentence "… to afford adequate deterrence to criminal conduct."

The government also respectfully submits that the defendant's current financial wherewithal enables him to pay a substantial fine. The PSR indicates the defendant's net worth is over $312,000—and that amount will likely increase once his seized weapons are sold by an FFL. Based on that, and the fact that the defendant likely profited from his illegal conduct in an amount close to or exceeding $100,000 by illegally selling firearms, a fine of $50,000 is also appropriate.

## Conclusion

Based on the defendant's knowing and criminal conduct, there is a legitimate need to impose a sentence in this case that will promote respect for the law, provide just punishment for the offense, deter the defendant from future criminal conduct, and protect the public from further crimes of the defendant, as well as a need to impose a period of formal supervision following his incarceration. The government respectfully submits to the Court that a sentence of **18 months** of imprisonment with three years of supervised release to follow and a $50,000 fine is sufficient, but not greater than necessary, in consideration of the statutory sentencing factors enumerated in Title 18, United States Code, Section 3553(a), and respectfully requests that this Court impose it.

Respectfully submitted this 20th day of December, 2018.

DAYLE ELIESON
United States Attorney

/s/ Phillip N. Smith, Jr.

PHILLIP N. SMITH, JR.
Assistant United States Attorney

13

**Certificate of Service**

I, Phillip N. Smith, Jr., certify that the Defendant will be served with a copy of the Government's Response to the Defendant's Sentencing Memorandum via electronic filing.

DATED: December 20, 2018.

                                         //s//
                                   PHILLIP N. SMITH, JR.
                                   Assistant United States Attorney